# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF MISSOURI
# SOUTHWESTERN DIVISION

|  |  |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> BCP INGREDIENTS, INC. <br><br> Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) Case No. 3:24-cv-05094 <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## COMPLAINT

Plaintiff, the United States of America, by authority of the Attorney General of the United States and through the undersigned attorneys, acting at the request of the Administrator of the United States Environmental Protection Agency ("EPA"), files this Complaint and alleges as follows:

## NATURE OF ACTION

1. This is a civil action brought under Section 113(b) of the Clean Air Act ("CAA"), 42 U.S.C. § 7413(b), seeking the assessment of civil penalties against BCP Ingredients, Inc. ("Defendant" or "BCP") for violations of Section 112(r)(7) of the CAA, 42 U.S.C. § 7412(r)(7), and its implementing regulations at 40 C.F.R. Part 68, at Defendant's chemical manufacturing and processing facility in Verona, Missouri.

## JURISDICTION, VENUE, AND NOTICE

2. This Court has subject matter jurisdiction over this action and the parties pursuant to 42 U.S.C. § 7413(b) and 28 U.S.C. §§ 1331, 1345, and 1355.

3. Venue is proper in the Western District of Missouri under 42 U.S.C. § 7413(b) because it is the judicial district in which the alleged violations occurred and where Defendant does business at its chemical manufacturing and repackaging facility.

## DEFENDANT

4. BCP is a corporation organized and existing under the laws of the State of Missouri and at all times relevant to this Complaint owned and operated a chemical manufacturing and repackaging facility located at 299 Extension Street, Verona, Missouri (the "Facility").

5. Defendant is a "Person" within the meaning of Section 302(e) of the CAA, 42 U.S.C. § 7602(e).

6. At all times relevant to this Complaint, Defendant was the "Owner or Operator" of the Facility within the meaning of Section 112(a)(9) of the CAA, 42 U.S.C. § 7412(a)(9).

## STATUTORY AND REGULATORY BACKGROUND

7. The purpose of Section 112(r) of the CAA and its implementing regulations is "to prevent the [A]ccidental [R]elease and minimize the consequences of any such release" of Regulated Substances and extremely hazardous substances. 42 U.S.C. § 7412(r)(1).

8. An "Accidental Release" is an unanticipated emission of a Regulated Substance or other extremely hazardous substance into the ambient air from a Stationary Source. 42 U.S.C. § 7412(r)(2)(A); 40 C.F.R. § 68.3.

9. 42 U.S.C. § 7412(r)(2) and (3) mandate that the Administrator of the EPA promulgate a list of Regulated Substances, with threshold quantities, and define the Stationary

Sources that will be subject to the accident prevention regulations mandated by Section 112(r)(7), 42 U.S.C. § 7412(r)(7).

10. Pursuant to Section 112(r)(3), 42 U.S.C. § 7412(r)(3), EPA promulgated a list of Regulated Substances codified at 40 C.F.R. § 68.130.

11. The term "Regulated Substance" means a substance listed under Section 112(r)(3). 42 U.S.C. § 7412(r)(2)(B).

12. Section 112(r)(7), 42 U.S.C. § 7412(r)(7), provides that the Administrator of the EPA is authorized to promulgate regulations requiring owners or operators of a Stationary Source at which a Regulated Substance is present in more than a Threshold quantity to, among other things, prepare and implement a Risk Management Plan ("RMP") to detect and prevent or minimize accidental releases of Regulated Substances from the Stationary Source, and to provide a prompt emergency response to any such releases in order to protect human health and the environment.

13. Section 113(b) of the CAA, 42 U.S.C. § 7413(b), authorizes civil penalties of up to $25,000 per day for each violation of the CAA. This statutory maximum civil penalty has been increased to reflect inflation pursuant to the Debt Collection Improvement Act of 1996, 31 U.S.C. § 3701, as amended, and the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, 28 U.S.C. § 2461, as amended, up to $117,468 per day for each violation occurring after November 2, 2015, and assessed after January 6, 2023. *See* 88 Fed. Reg. 986 (Jan. 6, 2023) (codified at 40 C.F.R. pt. 19).

14. EPA has promulgated regulations to implement Section 112(r)(7), codified at 40 C.F.R. Part 68, requiring owners and operators of Stationary Sources that have more than a Threshold quantity of a Regulated Substance in a process to develop and implement a risk

- 3 -

Case 3:24-cv-05094-BP    Document 1    Filed 12/02/24    Page 3 of 20

management program that must be described in an RMP submitted to EPA and that includes, among other things, a management system, a hazard assessment, an accident prevention program, and an emergency response program.

15. A "Stationary Source" means, in relevant part, "any buildings, structures, equipment, installations or substance-emitting stationary activities … from which an [A]ccidental [R]elease may occur." Section 112(r)(2)(C) of the CAA, 42 U.S.C. § 7412(r)(2)(C).

16. "Threshold quantity" is the quantity specified for Regulated Substances pursuant to Section 112(r)(5) of the CAA, as amended, listed in 40 C.F.R. § 68.130, Tables 1, 2, 3, and 4, and determined to be present at a Stationary Source as specified in 40 C.F.R. § 68.115. 40 C.F.R. § 68.3.

17. "Process" is "any activity involving a [R]egulated [S]ubstance including any use, storage, manufacturing, handling, or on-site movement of such substances, or combination of these activities." 40 C.F.R. § 68.3 "Covered process" means "a process that has a [R]egulated [S]ubstance present in more than a [T]hreshold quantity as determined under [40 C.F.R.] § 68.115." Id.

18. Covered processes are separated into three categories, designated as Program 1, Program 2, and Program 3, with different requirements applicable to owners and operators of Stationary Sources under each Program. *See* 40 C.F.R. Part 68.

19. A Covered process is subject to Program 3 requirements as provided in 40 C.F.R. § 68.12(d) if the process does not meet the requirements of Program 1, as described in 40 C.F.R. § 68.10(g), and if it is in a specified North American Industrial Classification System code or is subject to the Occupational Safety and Health Administration ("OSHA") process safety management standard, 29 C.F.R. § 1910.119. 40 C.F.R. § 68.10(i).

20. The Owner or Operator of a Stationary Source subject to 40 C.F.R. Part 68 regulations shall submit a single RMP, as provided in §§ 68.150 to 68.185. The RMP shall include a registration that reflects all Covered processes. 40 C.F.R. § 68.12(a).

21. The Owner or Operator of a Stationary Source with a Covered process subject to Program 3 must comply with Program 3 as detailed in 40 C.F.R. § 68.12(d), including requirements to:

    (a) Conduct a hazard assessment in accordance with §§ 68.20 through 68.42. 40 C.F.R. § 68.12(d)(2);

    (b) Implement the chemical accident prevention requirements in §§ 68.65 through 68.87. 40. C.F.R. § 68.12(d)(3);

    (c) Coordinate response actions with local emergency planning and response agencies as provided in § 68.93. 40 C.F.R. § 68.12(d)(4); and

    (d) Develop and implement an emergency response program and conduct exercises provided in §§ 68.90 to 68.96. 40 C.F.R. § 68.12(d)(5).

22. Offsite consequence analyses prepared by the Owner or Operator of a Stationary Source, including offsite consequences in a hazard assessment required under 40 C.F.R. § 68.12(d)(2), must be reviewed and updated at least once every five years. 40 C.F.R. § 68.36 (a).

23. The chemical accident prevention provisions of 40 C.F.R. §§ 68.65 through 68.87 applicable to the Owner or Operator of a Stationary Source impose requirements to, among other things:

    (a) Compile written process safety information, as required by 40 C.F.R. § 68.65, that shall:

      1.      Be completed before conducting any process required by the rule and include information pertaining to the hazards of the Regulated Substances used or produced by the process, information pertaining to the technology of the process, and information pertaining to the equipment in the process. 40 C.F.R. § 68.65(a);

      2.      Include an evaluation of consequences of deviations from the technology of the Covered process. 40 C.F.R. § 68.65(c)(1)(v); and

      3.      Include information pertaining to the equipment in the Covered process, including ventilation system design and safety systems (e.g., interlocks, detection, or suppression systems). 40 C.F.R. § 68.65(d)(1)(v) and (d)(1)(viii);

(b)     Perform an initial process hazard analysis (PHA) on processes covered by Subpart D of Part 68 as soon as possible, but not later than June 21, 1999. These PHAs shall be updated and revalidated, based on their completion date. 40 C.F.R. § 68.67(a);

(c)     Develop and implement written operating procedures that provide clear instructions for safely conducting activities involved in each Covered process consistent with the process safety information, including development of such written operating procedures for steps of each operating phase listed in 40 C.F.R. § 68.69(a)(1)(i) through (vii). 40 C.F.R. § 68.69(a);

(d)     Comply with mechanical integrity requirements under 40 C.F.R. § 68.73, including:

> 1. Applying such requirements to certain process equipment, including controls (including monitoring devices, and sensors, and alarms). 40 C.F.R. § 68.73(a)(5);
>
> 2. Establishing and implementing written procedures to maintain the ongoing integrity of process equipment. 40 C.F.R. § 68.73(b); and
>
> 3. Correcting deficiencies in equipment that are outside acceptable limits (defined by the process safety information in § 68.65) before further use, or in a safe and timely manner as long as necessary means are taken to assure safe operation until the deficiency is or deficiencies are corrected. 40 C.F.R. § 68.73(e);
>
> (e) Certify that the Owner or Operator has evaluated compliance with Subpart D, the Program 3 Prevention Program provisions, at least every three years to verify that the procedures and practices developed under Subpart D are adequate and are being followed. 40 C.F.R. § 68.79(a); and
>
> (f) Promptly determine and document an appropriate response to each of the findings of a compliance audit, and document that deficiencies have been corrected. 40 C.F.R. § 68.79(d).

24. The Owner or Operator of a Stationary Source must coordinate response needs with local emergency planning and response organizations to determine how the community emergency response plan addresses the Stationary Source and to ensure that local response organizations are aware of the Regulated Substances at the Stationary Source, their quantities, the risks presented by Covered processes, and the resources and capabilities at the Stationary Source to respond to an Accidental Release of a Regulated Substance. 40 C.F.R. § 68.93. This

coordination shall occur at least annually, and more frequently if necessary, to address changes at the Stationary Source, in the Stationary Source's emergency response and/or emergency action plan, and/or in the community emergency response plan. 40 C.F.R. § 68.93(a).

25. The Owner or Operator of a Stationary Source must review and update the RMP submitted under 40 C.F.R. § 68.150 in the method and format specified by EPA as of the date of submission at least once every five years from the date of its initial submission or most recent update required by paragraphs (b)(2) through (b)(7) of § 68.190, whichever is later. 40 C.F.R. § 68.190(a) and (b)(1).

## GENERAL ALLEGATIONS

26. At all times relevant to this Complaint, Defendant owned and operated the Facility, where it repackaged ethylene oxide and uses ethylene oxide, trimethylamine, hydrochloric acid, and various other compounds and ingredients to produce choline chloride, choline bitartrate, and choline dihydrogen citrate.

27. At all times relevant to this Complaint, the Facility was a "Stationary Source" as defined by Section 112(r)(2)(C) of the CAA, 42 U.S.C. § 7412(r)(2)(C).

28. Ethylene oxide ("EtO") is a "Regulated Substance" pursuant to 40 C.F.R. § 68.3. The Threshold quantity for EtO, as listed in 40 C.F.R. § 68.130 Table 1, is 10,000 pounds.

29. EtO is a highly toxic, flammable, and reactive gas. It has a wide range of flammable concentrations in air (3% to 100%) and may polymerize violently in the presence of certain metals. The Immediately Dangerous to Life or Health ("IDLH") concentration for EtO has been set at 800 parts per million (ppm) by the National Institute for Occupational Health and Safety ("NIOSH"). The Permissible Exposure Limit ("PEL") has been set at 1ppm by OSHA.

30. Acute exposures to EtO gas may result in respiratory irritation and lung injury, headache, nausea, vomiting, diarrhea, shortness of breath, and cyanosis. Chronic exposure has been associated with the occurrence of cancer, reproductive effects, mutagenic changes, neurotoxicity, and sensitization.

31. Trimethylamine is a "Regulated Substance" pursuant to 40 C.F.R. § 68.3. The Threshold quantity for trimethylamine, as listed in 40 C.F.R. § 68.130, Table 3, is 10,000 pounds.

32. Trimethylamine is a highly flammable and easily ignitable gas. It produces toxic oxides of nitrogen during combustion. Prolonged exposure to heat can cause the container to rupture violently. The NIOSH Pocket Guide, "Incompatibilities and Reactivities" section states that trimethylamine should be kept away from EtO and other strong oxidizers.

33. Acute exposure of humans to trimethylamine vapor causes eye irritation, corneal swelling, halo vision, skin irritation, and irritation of the mucous membranes. Chronic exposure of workers to trimethylamine vapor has been observed to cause reversible corneal edema. Chronic inhalation exposure has resulted in respiratory and hematological effects and eye lesions in laboratory animals.

34. At all times relevant to this Complaint, one or more of the processes Defendant used with regard to EtO and/or trimethylamine is a Covered process subject to Program 3 because it does not meet one or more of the Program 1 eligibility requirements set forth in 40 C.F.R. § 68.10(g) and such Covered process(es) was/were subject to OSHA process safety management standard, 29 C.F.R. § 1910.119. 40 C.F.R. § 68.10(i).

35. At all times relevant to this Complaint, the Facility was subject to the regulations in 40 C.F.R. Part 68, including risk management program provisions of Section 112(r)(7),

because it was a "Stationary Source" that produced, processed, handled, and/or stored one or more Regulated Substances above the Threshold quantity in a Covered process. 40 C.F.R. § 68.10 (a) and (b).

36. At all times relevant to this Complaint, Defendant was required to submit an RMP, as provided in §§ 68.150 to 68.185, that includes registration to reflect all Covered processes. 40 C.F.R. § 68.12(a).

37. At all times relevant to this Complaint, Defendant was required to comply with the Program 3 requirements set forth in 40 C.F.R. § 68.12(d) because its Facility included one or more Covered processes subject to those requirements.

38. At all times relevant to this Complaint, Defendant was required to review and update offsite consequence analyses, including for any required PHA under 40 C.F.R. § 68.12(d)(2), at least once every five years. 40 C.F.R. § 68.36(a).

39. At all times relevant to this Complaint, Defendant was required to comply with the chemical accident prevention provisions of 40 C.F.R. §§ 68.65 through 68.87.

40. At all times relevant to this Complaint, Defendant was required by 40 C.F.R. § 68.69(a)(1) to develop and implement written operating procedures that provide clear instructions for safely conducting activities involved in each Covered process consistent with the process safety information, including development of such written operating procedures for steps of each operating phase of a Covered process listed in § 68.69(a)(1)(i) through (vii).

41. At all times relevant to this Complaint, Defendant was required to comply with the requirements for emergency response coordination detailed in 40 C.F.R. § 68.93 at least annually. 40 C.F.R. § 68.93(a).

42. At all times relevant to this Complaint, Defendant was required to revise and update the RMP submitted under 40 C.F.R. § 68.150 at least once every five years from the date of its initial submission or most recent update required by paragraphs (b)(2) through (b)(7) of § 68.190, whichever is later. 40 C.F.R.§ 68.190(a) and (b)(1).

43. On April 8, 2022, during railcar unloading, Defendant spilled approximately 1,290 gallons of liquid EtO onto the ground, releasing EtO gas into the atmosphere.

44. Defendant provided its root cause evaluation for the April 8, 2022 spill, titled "BCP Ingredients -Written Follow-Up Report – April 8, 2022 - Ethylene Oxide Release" (hereafter referred to as "Root Cause Evaluation") to EPA on May 21, 2022.

45. EPA inspected Defendant's Facility from June 7 – 9, 2022, to determine compliance with Section 112(r) of the Clean Air Act, 42 U.S.C. § 7412(r).

46. On August 19, 2022, EPA issued an Information Request to BCP pursuant to CAA Section 114, 42 U.S.C. § 7414, to obtain additional information regarding compliance with CAA Section 112(r), including information requested during EPA's inspection that BCP had not yet provided.

47. EPA identified several violations of the CAA based on its observations during the inspection and review of the documents and information provided by BCP.

48. On September 22, 2022 (as amended on January 19, 2023), EPA entered an Administrative Order for Compliance on Consent ("AOC") with BCP requiring BCP to remedy the violations EPA had identified. BCP has complied with the AOC and completed all requirements.

# FIRST CLAIM FOR RELIEF
## Failure to Develop Operating Procedures for Each
## Operating Phase of a Covered Process

49. Paragraphs 1 through 48 are realleged and incorporated here by reference.

50. 40 C.F.R. § 68.69(a)(1)(i) through (vii), required BCP to have Standard Operating Procedures ("SOPs") for steps of each operating phase of a Covered process, including:

> i. Initial startup;
> ii. Normal operations;
> iii. Temporary operations;
> iv. Emergency shutdown including the conditions under which emergency shutdown is required, and the assignment of shutdown responsibility to qualified operators to ensure that emergency shutdown is executed in a safe and timely manner;
> v. Emergency operations;
> vi. Normal shutdown; and
> vii. Startup following a turnaround, or after an emergency shutdown.

51. Until at least February 17, 2023 Defendant did not have SOPs for all steps of each operating phase of a Covered process, as required by 40 C.F.R. § 68.69(a)(1)(i) through (vii). BCP did not have SOPs for emergency shutdown, emergency operations, and startup following a turnaround or after an emergency shutdown.

52. Defendant's failure to have SOPs for all steps of each operating phase of a Covered process violated 40 C.F.R. § 68.69(a)(1)(i) through (vii) and Section 112(r) of the CAA, 42 U.S.C. § 7412(r).

53. Pursuant to Section 113(b) of CAA, 42 U.S.C. § 7413(b), Defendant is liable for civil penalties to the United States of not more than the per-day per-violation amounts set forth in Paragraph 13 above.

# SECOND CLAIM FOR RELIEF
## Failure to Correct Deficiencies in Mechanical Integrity of Equipment Used in a Covered Process

54. Paragraphs 1 through 48 are realleged and incorporated here by reference.

55. 40 C.F.R. § 68.65(d)((1)(viii) required BCP to compile written process safety information pertaining to equipment in a Covered process, including such equipment's safety system(s), including equipment used for detection such as audible alarms.

56. Railcar unloading at the Facility is a Covered process because it is a process in which a Regulated Substance, EtO, is present in a quantity greater than the Threshold quantity of 10,000 pounds. 40 C.F.R. § 68.3.

57. BCP was also required to document that the equipment in the process complies with recognized and generally accepted good engineering practices. 40 C.F.R. § 68.65(d)(2).

58. When unloading EtO from railcars, audible alarms are recognized and generally accepted good engineering practices.

59. BCP installed audible alarms to detect any EtO leak during EtO railcar unloading and alert personnel in the control room.

60. BCP failed to include the alarms in its operating procedures developed pursuant to 40 C.F.R. § 68.69, as it should have.

61. Alarms are among the types of controls subject to mechanical integrity requirements in 40 C.F.R. § 68.73. 40 C.F.R 68.73(a)(5).

62. BCP was required to correct deficiencies in process equipment, including controls such as alarms, that are outside acceptable limits (defined by the process safety information in 40 C.F.R. § 68.65) either before further use or in a safe and timely manner when necessary means are taken to assure safe operation. 40 C.F.R. § 68.73(e).

63. The audible alarms and wiring from the alarms to the control room that were part of the process equipment used during EtO Railcar unloading were damaged by a flood in May

2021 and rendered non-functional. Defendant did not fully repair this damage until after April 11, 2022.

64. The audible alarms were not functional during the April 8, 2022 EtO release, which contributed to the release of EtO continuing for seven hours.

65. By failing to include the alarms in its operating procedures under 40 C.F.R. § 68.69 and failing to repair the alarms between May 2021 and April 11, 2022, BCP violated Section 112(r) of the CAA, 42 U.S.C. § 7412(r), and its implementing regulations at 40 C.F.R. § 68.73(e).

66. Pursuant to Section 113(b) of CAA, 42 U.S.C. § 7413(b), Defendant is liable for civil penalties to the United States of not more than the per-day per-violation amounts set forth in Paragraph 13 above.

### THIRD CLAIM FOR RELIEF
**Failure to Follow Standard Operating Procedures Regarding EtO Railcar Unloading**

67. Paragraphs 1 through 48 are realleged and incorporated here by reference.

68. Defendant unloads approximately 170,000 pounds of EtO at a time when it unloads railcars arriving at the Facility.

69. BCP was required to develop and implement SOPs governing EtO railcar unloading because it is a Covered process. 40 C.F.R. § 68.69(a).

70. BCP's visual monitoring SOP for EtO railcar unloading required that the unloading must be visually monitored at all times either in-person by two employees or by camera pointed at the platform where unloading is occurring.

71. During the April 2022 EtO release from EtO railcar unloading, only one employee was present prior to and during railcar unloading. During the April 2022 EtO release

from EtO railcar unloading, BCP had only one camera for the two railcar unloading platforms, which was pointed at the platform that was not in use.

72. Contrary to the visual monitoring SOP, the operational railcar unloading platform, where the accident occurred, was not visually monitored.

73. Another EtO railcar unloading SOP required that a UNIPRO valve actuator must be attached to the liquid valve and the vapor valve each time a railcar is unloaded. The purpose of the UNIPRO valve is to shut off the railcar valve in the event the area monitors detect a leak.

74. During the April 2022 EtO release from EtO railcar unloading, contrary to its SOP, BCP did not connect a UNIPRO valve to the railcar from which the spill occurred. Thus, when the area monitors finally detected the leak, the railcar valve was not automatically shut off.

75. BCP's failure to comply with the visual monitoring and UNIPRO valve requirements of its railcar unloading SOPs contributed to the release of EtO going unnoticed initially and contributed to its seven-hour duration.

76. Defendant's failures to implement the visual monitoring and UNIPRO valve connection requirements contained in BCP's railcar unloading SOPs violated 40 C.F.R. §§ 68.69(a) and 68.73(a)(5), and Section 112(r) of the CAA, 42 U.S.C. § 7412(r).

77. Pursuant to Section 113(b) of CAA, 42 U.S.C. § 7413(b), Defendant is liable for civil penalties to the United States of not more than the per-day per-violation amounts set forth in Paragraph 13 above.

## **FOURTH CLAIM FOR RELIEF**
**Failure to Perform a Process Hazard Analysis on Process 10000114872, EtO Drum Truck Storage**

78. Paragraphs 1 through 48 are realleged and incorporated here by reference.

79. Process 10000114872 EtO Drum Truck Storage ("EtO Drum Truck Storage") has a maximum capacity of 120,000 pounds of EtO. The process covers two truck parking spaces where filled 400-pound containers of EtO are stored until shipping.

80. Defendant's EtO Drum Truck Storage is a Covered process because it is a process in which a Regulated Substance, EtO, is present in a quantity greater than the Threshold quantity of 10,000 pounds. 40 C.F.R. § 68.3.

81. Defendant's records listed a PHA completion date of May 22, 2019, but Defendant was unable to provide any documentation of the PHA. On information and belief, Defendant did not perform a PHA for EtO Drum Truck Storage until October 9, 2022.

82. Defendant's failure to perform a PHA for EtO Drum Truck Storage violates 40 C.F.R. § 68.67(a) and Section 112(r) of the CAA, 42 U.S.C. § 7412(r).

83. As a result of the above-listed violation, pursuant to Section 113(b) of CAA, 42 U.S.C. § 7413(b), Defendant is liable for civil penalties to the United States of not more than the per-day per-violation amounts set forth in Paragraph 13 above.

## FIFTH CLAIM FOR RELIEF
**Failure to Correct Deficiencies Identified in Prior Compliance Audit;  
Failure to Certify and Ensure that Compliance Audits  
Were Completed at Least Every Three Years**

84. Paragraphs 1 through 48 are realleged and incorporated here by reference.

85. Defendant's 2014 compliance audit identified the following deficiency: PHA for Drum Truck Storage had never been conducted. BCP's September 2020 compliance audit noted that BCP never corrected this deficiency.

86. BCP's September 2016 and 2020 compliance audits were not certified.

87. BCP's 2020 compliance audit did not occur within three years of its 2016 compliance audit.

88. Defendant's failures to correct a deficiency identified in a prior compliance audit, to certify multiple compliance audits, and to ensure that compliance audits were conducted every three years violate 40 C.F.R. § 68.79(d) and Section 112(r) of the CAA, 42 U.S.C. § 7412(r).

89. Pursuant to Section 113(b) of CAA, 42 U.S.C. § 7413(b), Defendant is liable for civil penalties to the United States of not more than the per-day per-violation amounts set forth in Paragraph 13 above.

## SIXTH CLAIM FOR RELIEF
**Failure to Coordinate with Emergency Responders**

90. Paragraphs 1 through 48 are realleged and incorporated here by reference.

91. BCP did not conduct emergency response coordination activities from at least June 9, 2021 to June 9, 2022.

92. Defendant's failure to conduct required emergency response coordination activities in each of the past two years violated 40 C.F.R. § 68.93(a) and Section 112(r) of the CAA, 42 U.S.C. § 7412(r).

93. As a result of the above-listed violation, pursuant to Section 113(b) of CAA, 42 U.S.C. § 7413(b), Defendant is liable for civil penalties to the United States of not more than the per-day per-violation amounts set forth in Paragraph 13 above.

## SEVENTH CLAIM FOR RELIEF
**Failure to Update Offsite Consequence Analysis Included in Hazard Assessment**

94. Paragraphs 1 through 48 are realleged and incorporated here by reference.

95. BCP's Facility has a storage capacity of over 2,440,000 pounds for EtO and 1,400,000 pounds for trimethylamine.

96. BCP had not updated the offsite consequence analysis for EtO and trimethylamine to determine distances to toxic endpoints from any potential chemical release(s) of either substance from October 22, 2004 until October 17, 2022.

97. Defendant's failure to review and update its offsite consequence analyses at least once every five years violates 40 C.F.R. § 68.36(a) and Section 112(r) of the CAA, 42 U.S.C. § 7412(r).

98. As a result of the above-listed violation, pursuant to Section 113(b) of CAA, 42 U.S.C. § 7413(b), Defendant is liable for civil penalties to the United States of not more than the per-day per-violation amounts set forth in Paragraph 13 above.

### EIGHTH CLAIM FOR RELIEF
**Failure to Have Required Written Safety Information for Ventilation System Design, Process Safety System, and Consequences of Deviation**

99. Paragraphs 1 through 48 are realleged and incorporated here by reference.

100. Upon information and belief, Defendant did not have required written safety information, including ventilation system design, process safety systems, and consequences of deviation, for a majority of the equipment used in Covered processes in the Facility, including equipment in the EtO repackaging process building (V25), the aqueous choline process building (V8), the choline bitartrate building (V10), ethanol distillation building (V14), and the control room. §

101. Defendant's failure to have a written ventilation system design until November 18, 2022 and failure to have written process safety system information, including consequences of deviation, for equipment used in Covered processes within certain areas at the Facility until December 19, 2022 violated 40 C.F.R. § 68.65(d)(1)(v) and (d)(1)(viii) and Section 112(r) of the CAA, 42 U.S.C. § 7412(r).

102. As a result of the above-listed violation, pursuant to Section 113(b) of CAA, 42 U.S.C. § 7413(b), Defendant is liable for civil penalties to the United States of not more than the per-day per-violation amounts set forth in Paragraph 13 above.

### NINTH CLAIM FOR RELIEF

**Failure to Submit a Risk Management Plan Every Five Years**

103. Paragraphs 1 through 48 are realleged and incorporated here by reference.

104. BCP submitted its RMP 28 days late, on February 25, 2021.

105. Defendant's failure to timely submit its RMP violates 40 C.F.R. § 68.190(b)(1) and Section 112(r) of the CAA, 42 U.S.C. § 7412(r).

106. As a result of the above-listed violation, pursuant to Section 113(b) of CAA, 42 U.S.C. § 7413(b), Defendant is liable for the assessment of civil penalties to the United States of not more than the per-day per-violation amounts set forth in Paragraph 13 above.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff, the United States of America respectfully requests that the Court grant the following relief:

1. Under 42 U.S.C. § 7413(b), assess civil penalties against Defendant of up to $117,468 per day for each violation of the CAA occurring after November 2, 2015, and assessed after January 6, 2023;

2. Grant such other relief as the Court deems just and proper.

Plaintiff hereby requests that trial of the above and foregoing action should be held in Springfield, Missouri, and that the case be calendared accordingly.

Respectfully submitted,

TODD S. KIM
Assistant Attorney General
Environment & Natural Resources Division
United States Department of Justice

*s/ Joanna Citron Day*
JOANNA CITRON DAY
Senior Counsel
DC Bar Number: 477833
Environmental Enforcement Section
Environment & Natural Resources Division
United States Department of Justice
P.O. Box 7611
Washington, DC 20044-7611
Telephone: (202) 514-3394
Joanna.day@usdoj.gov

TERESA A. MOORE
United States Attorney

JEFFREY P. RAY
Deputy United States Attorney
Charles Evans Whittaker Courthouse
400 East Ninth Street, Fifth Floor
Kansas City, MO 64106
Telephone: (861) 426-4300
Jeffrey.ray@usdoj.gov


OF COUNSEL:

SARA HERTZ WU
Office of Regional Counsel
United States Environmental Protection Agency, Region 7
11201 Renner Blvd.
Lenexa, Kansas 66219
Telephone: 913-551-7316
Email: hertzwu.sara@epa.gov